### In re CORPORATE FOOD MANAGEMENT, INC., Debtor.

### CORPORATE FOOD MANAGEMENT, INC., Plaintiff,

### v.

### SUFFOLK COMMUNITY COLLEGE, Defendant.

Bankruptcy No. 095–73094–511.
Adversary No. 096–7005–511.

United States Bankruptcy Court,
E.D. New York.

July 9, 1998.

Finkel Goldstein Berzow Rosenbloom & Nash, L.L.P., New York City, By Kevin J. Nash, for Official Committee of Unsecured Creditors.

Robert C. Cimino, Suffolk County Attorney, Hauppauge, NY, By Herbert A. Smith, Jr., for Defendant.

### DECISION

#### (Motion for Summary Judgment)

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

By its motion, the Official Committee of Unsecured Creditors (the "Committee"), the assignee of the plaintiff-Debtor, Corporate Food Management, Inc. (the "Debtor"), seeks summary judgment: (a) declaring that three pre-petition transactions between the Debtor and the defendant, Suffolk Community College ("SCC"), constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547, and (b) directing that SCC turn over the sum of $33,163.56, plus accrued interest, to the bankruptcy estate pursuant to 11 U.S.C. § 550 on account of these alleged preferential transfers.[1] SCC opposes the relief requested on the grounds that numerous issues of fact are genuinely in dispute, thus mandating the denial of the Committee's motion for summary judgment.

Having fully considered the papers presented and the arguments of counsel, the Court concludes that there are questions of material fact relevant to two of the three transactions and, as a consequence, that portion of the Committee's motion for summary judgment must be denied. With respect to the third transaction involving a written assignment, however, the Court finds that the Committee has met its burden pursuant to 11 U.S.C. § 547(b) and (g) and directs that the matter proceed to trial on the issue of SCC's affirmative defenses. This decision consti-

tutes the Court's findings of fact and conclusions of law to the extent that the same are required by Fed. R. Bankr.P. 7052(b).

### BACKGROUND

#### A. Procedural Background

An involuntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code was filed against the Debtor on November 6, 1995. Thereafter, the Debtor voluntarily moved to convert the involuntary Chapter 7 proceeding to a case under Chapter 11. The Order granting Debtor's request for a voluntary conversion was entered on November 7, 1995. In January 1996, the Committee was appointed by the Office of the U.S. Trustee. The instant adversary proceeding was commenced by the Debtor (and *not* by the Committee) on January 16, 1996.

As part of a proposed structured dismissal of the bankruptcy proceeding, and pursuant to this Court's Order, dated May 29, 1996, the Debtor assigned all of its assets, including its rights in the instant adversary proceeding, to the Committee for liquidation and subsequent distribution to creditors. Accordingly, as of the date of the May 29 Order, the Committee assumed the prosecution of the proceeding.

#### B. Factual Background

Prior to the bankruptcy filing, the Debtor was in the food service industry and operated its business throughout the Metropolitan area. It provided cafeteria style service as well as vending machine concessions. In 1992, the Debtor was awarded a contract by the County of Suffolk, Department of General Services, to provide food service operations for SCC at its Brentwood and Selden Campuses. Under the terms of the contract,[2] the Debtor was obligated to pay SCC

---

1. This adversary proceeding also sought an order directing SCC to turn over miscellaneous personal property owned by the Debtor on the filing date, which was previously located at the College. The Committee has acknowledged that this property is currently available for return or has, in fact, been returned. It therefore appears that this part of the dispute has been resolved despite the lack of formal advice to the Court. *See*

Committee's Motion for Summary Judgment, at 6 n. 1.

2. The Committee states that a complete copy of the contract at issue is annexed to its Motion at Exhibit B, but it is not. Instead, Exhibit B is titled "Proposal for: Food/Vending Service." This "proposal" is not signed by any party to the alleged contract. Nonetheless, pursuant to the

certain commissions on its catering and vending machine operations. The contract between the parties, under the heading "Payments by Contractor," provides in pertinent part:

1. The Contractor will pay the Suffolk Community College a commission in the percentage of gross sales as proposed by the successful bidder, exclusive of sales tax, on all income received except for vending machine revenue and except for catering revenue.

2. The payments indicated in 1 above, and 7 and 8 of the contract specifications[3], shall be made monthly within thirty (30) days following the end of the month. That portion of Contractor receipts due the College shall vest in and become the property of the College upon collection. The College shall have a continuing lien on all personal property of the Contractor for any and all sums due the College in connection with this agreement. . . .

3. Payments, as specified in paragraph 2 above, due for periods commencing on and after July 1, 1992, may be paid to an escrow account, in an amount not to exceed $25,000 per annum, to be used for expenditures to alter or improve the College facilities. Any such alterations or improvements shall become the property of the College. The Contractor must receive the permission of the College before commencing any such work. . . . The escrow account herein shall be established with the provision that no withdrawals be made without the signature of a College official. Any balance in the escrow account shall, upon termination of the contract, be paid over to the College.

The above quoted provisions are the only provisions in the contract that speak to the

terms and conditions concerning the formation of an escrow account.

On or about July 27, 1994, the principals of the Debtor, together with a vice president of SCC, opened an account at Citibank. Although there is a dispute concerning the nature of this account, the account information questionnaire indicates that the parties were applying for a "business checking account," the title of the account was "Corp Food Mgt/SCC Escrow," and the account number was 46970811 (the "Escrow Account"). The account signature cards require the signatures of two of the three signatories in order to transact business with the bank.[4] The signature card was signed by the president and treasurer of the Debtor, and SCC's vice president.

At all relevant times, the Debtor maintained possession of the check book for the Escrow Account, and all statements regarding this account were sent to Debtor's place of business. A hand-written deposit ticket, submitted in support of the motion, shows that $28,492 was deposited on August 5, 1994 into the Escrow Account. Almost one year later, in June 1995, the Debtor withdrew $24,243.92 from the Escrow Account and transferred these monies to the bank account of its affiliate, Accents in Catering, Inc. ("AIC"), bearing account no. 1824–01390–6.

The parties dispute the circumstances surrounding the termination of the contract between the Debtor and SCC on August 11, 1995. The Committee asserts that a controversy arose between the Debtor and SCC concerning payment obligations under the Contract and that SCC unilaterally attempted to terminate the contract and prohibit the Debtor from entering the campus cafeteria. SCC acknowledges that a dispute had arisen regarding the payment of commissions, but asserts that it was the Debtor which had

parties' Local Rule 7056–1 Statements, it is undisputed that the "proposal" encompasses the terms of the actual contract. Accordingly, for purposes of this motion, the terms contained in the "proposal" as found in Exhibit B will be deemed to be those found in the contract.

3. Paragraphs 7 and 8 of the contract specifications set forth the percentages necessary to compute the commissions owed to SCC. *See* Committee's Motion for Summary Judgment, Exh. B.

4. In addition, SCC submitted a copy of Debtor's corporate resolution pertaining to the opening of this account, which provides that the Debtor's "President or Treasurer and Steve Schrier (SCC's vice president) jointly is/are hereby authorized (i) to sign for on behalf of the Corporation, any and all checks . . . with respect to any funds any time(s). . . ." *See* Affidavit of Steven Schrier (the "Schrier Aff."), Exh. A.

informed SCC that it would no longer be able to provide food services pursuant to the contract. Regardless, it is undisputed that SCC sent the Debtor a termination notice, dated August 11, 1995 (the "Termination Date"), which provided that the cafeteria was closed to all of Debtor's employees and that such action was necessitated by the Debtor's admittedly precarious viability and the lack of response to SCC's statement of account due and owing.

The Debtor had apparently committed itself to catering functions for a period of time after the Termination Date, although it is disputed whether those functions were College-related or not. In any event, the termination of the contract meant that the Debtor could not use the College facilities to prepare for these functions. The Committee argues that, in order to obtain limited access to the College to perform these functions, the Debtor was required to pay SCC $26,243.98 on account of accrued commissions and other debts chargeable to the Debtor for utility service. By its Statement of Disputed Facts, SCC attempts to dispute this allegation, but fails to specify what the exact dispute is.[5]

Nonetheless, it is undisputed that two checks were tendered to SCC on the Termination Date. One check was in the amount of $24,243.98 and in the form of a cashier's check from North Fork Bank. This cashier's check, in the bottom left-hand corner bears the notation "183/1824013906," which reflects the number of the bank account maintained by AIC.[6] The second check was in the amount of $2,000 and also in the form of an official check from Citibank, N.A. The second

check contained the notation: "Name of Remitter Corporate Food Management, Marian Vitale, 49110569."

It is also undisputed that the Debtor executed an assignment on the Termination Date in which it assigned to SCC all of the Debtor's rights, title and interest to all payments due from Suffolk College Associates, Inc. ("SCA"). The assignment provides, in pertinent part:

> CORPORATE FOOD MANAGEMENT, INC. hereby affirms that CORPORATE FOOD MANAGEMENT, INC. owes SUFFOLK COMMUNITY COLLEGE certain monies pursuant to the terms of the above-described Request for Proposal and the Proposal submitted to and accepted by SUFFOLK COMMUNITY COLLEGE.

While the parties concede that the assignment was a condition of Debtor's re-entry onto the College premises, SCC asserts that the assignment was executed as part of a new agreement with the Debtor to allow it to utilize the College's facilities for food preparation for its remaining functions. The Committee disagrees. In any event, it is undisputed that SCC received a total of $6,919.08 from SCA pursuant to the assignment and that all payments were received during the month of August 1995.

## DISCUSSION

### 1. The Standard Governing Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure [7] states that a motion for summary judgment shall be granted:

---

**5.** SCC's Statement of Disputed Facts, in response to Statement "7" of the Committee's Statement of Undisputed Facts, provides: "The payments and assignment requested by the College, as well as the return of the money taken from the escrow account." This incomplete sentence apparently is meant to dispute the Committee's assertion that the Debtor was compelled to pay SCC the sums on account of accrued commissions. Unfortunately, this incomplete sentence fails to adequately do so.

**6.** SCC does not dispute the facts contained in paragraph "14" of the Committee's Statement of Undisputed Facts, which provides:

> At least $24,243.92 paid to SCC in connection with the Direct Payments came from an ac-

count maintained by the Debtor at Citibank entitled, "Corporate Food Mgt. SCC Escrow", Account No. 46970811.

However, this statement is directly contradicted by the evidentiary record submitted in connection with the pending motion. That is, the check paid to SCC clearly bears the account number of AIC, thus establishing that these funds, at least on August 11, 1995, did not come from the Escrow Account but, rather, came from the bank account of Debtor's affiliate.

**7.** Rule 5 governs a motion for summary judgment in an adversary proceeding by virtue of Rule 7056 of the Federal Rules of Bankruptcy Procedure.

[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56. Accordingly, in ruling upon a summary judgment motion, the Court must determine whether a genuine issue of fact exists; it is not the Court's province at this stage of the proceeding to resolve disputed issues of fact if any are demonstrated to exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, the Court must draw all ambiguities and reasonable inferences in favor of the non-moving party. *Thornton v. Syracuse Savings Bank*, 961 F.2d 1042 (2d Cir.1992); *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314 (2d Cir.1992).

The movant carries the initial burden of showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett, supra*, 477 U.S. at 325, 106 S.Ct. 2548; *Kurtzman v. National Union Fire Ins. Co.*, 147 B.R. 335, 338 (Bankr. S.D.N.Y.1992); *CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131, 135 (Bankr.S.D.N.Y.1992). The summary judgment motion should be granted only if (1) there is no genuine issue as to any material fact, and (2) the movant is entitled to judgment as a matter of law. Otherwise, it must be denied. *Anderson, supra*, 477 U.S. at 247–52, 106 S.Ct. 2505; *Hamilton v. Smith*, 773 F.2d 461, 466 (2d Cir.1985).

When a motion for summary judgment is made and supported by the movant, Rule 56(e) requires the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." [8] Fed.R.Civ.P. 56(e). The non-moving party may not defeat a properly supported motion by relying on self-serving and conclusory statements concerning the nature of the facts, and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio, supra*, 475 U.S. at 586, 106 S.Ct. 1348. The non-movant must ultimately demonstrate that there is some evidence which would create a genuine issue of material fact.[9] *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 177–78 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505).

■ E.D.N.Y. LBR 7056–1, formerly Rule 22(b) of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York, requires a moving party to set forth, with specificity, each material fact as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion. In turn, the non-moving party is required to set forth the "material facts as to which it is contended that there exists a genuine issue to be tried." E.D.N.Y. LBR 7056–1.

■ Generally, all material facts included by the moving party in its statement are deemed admitted unless they are "directly contradicted" by an opposing statement. *Id.* However, the local rule "cannot preclude consideration of all other submissions. Such a restrictive interpretation would be at odds

---

8. Fed.R.Civ.P. 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment,

if appropriate, shall be entered against the adverse party.

9. Perfunctory statements, vague charges and conclusory allegations made in an opposition brief are not enough to defeat a motion for summary judgment. *Bank of China v. Chan*, No. 88 CIV. 0232 MBM, 1990 WL 53007 (S.D.N.Y. April 23, 1990), *rev'd in part on other grounds*, 937 F.2d 780 (2d Cir.1991); *Hysell v. Mercantile Stores Co.*, 736 F.Supp. 457 (S.D.N.Y.1989).

with the goal of summary judgment." *Usina Costa Pinto, S.A. v. Louis Dreyfus Sugar Co.*, 933 F.Supp. 1170, 1175 n. 2 (S.D.N.Y. 1996) (citing *Brady v.. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir.1988)). Accordingly, "if there is any evidence in the record from which a reasonable inference may be drawn in the non-movant's favor, summary judgment is inappropriate." *Brady, supra*, 863 F.2d at 210–11. With these standards in mind, the Court now turns to the contentions of the parties.

### 2. The Alleged Preferences

At issue are three transactions, all of which took place on August 11, 1995:(1) the $24,243.98 payment to SCC; (2) the $2,000 payment to SCC; and (3) the execution and delivery of the written assignment in favor of SCC. Not surprisingly, the Committee argues that are no material issues of fact concerning any of these transactions. The SCC disagrees and contends that numerous issues of fact exist with respect to: (i) the Debtor's interest in the property in question; (ii) whether these transactions were made in the ordinary course of business; (iii) the characterization of the account in question; and (iv) whether new value was given for these transfers.

■ Any analysis must begin with Section 547 of the Bankruptcy Code, which provides in pertinent part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case was a case under chapter 7 of this title;

(B) the transfer had not been made; and

(c) such creditor received payment of such debt to the extent provided by the provisions of this title.

Initially, the burden of proof falls on the party alleging that a preferential transfer exists, *i.e.*, the Committee, and it must prove each element by a preponderance of the evidence. *See In re Child World, Inc.*, 173 B.R. 473, 476 (Bankr.S.D.N.Y.1994); *see also* 11 U.S.C. § 547(g). "If the [movant] puts forth sufficient proof to establish a *prima facie* preference, the burden shifts and the creditor is given the opportunity to establish by a preponderance of the evidence that one of the enumerated exceptions in 11 U.S.C. § 547(c) applies." *Child World*, 173 B.R. at 476 (citations omitted); *see also* 11 U.S.C. § 547(g).

■ The preference provisions of the Bankruptcy Code advance "the prime bankruptcy policy of equality of distribution among creditors of the debtor" and "discourage a race by the creditor to collect payment while the debtor is still marginally solvent, or a race to the courthouse to force the debtor into bankruptcy." *Id.* (citations omitted). Because a " 'preference is an infraction of the rule of equal distribution among all creditors,' ... neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b)." *Matter of Criswell*, 102 F.3d 1411, 1414 (5th Cir. 1997) (*quoting* Lawrence P. King, ed., 4 *Collier on Bankruptcy* ¶ 547.01, at 547–12—547–13 (15th ed.1996)). "[I]t is the *effect* of the transaction, rather than the debtor's or creditor's *intent*, that is controlling." 5 *Collier on Bankruptcy* ¶ 547.01, at 547–10 (15th ed.1998). Put simply, if the creditor receives a greater payment than others in his class, he will be required to disgorge what he has received so that all creditors may share equally. *Id.* at 547–9.

### A. The $24,243.98 Payment

■ Although the Committee contends that "much of this adversary proceeding turns upon whether a valid binding and enforceable escrow was created by SCC," the threshold question is whether there was a "transfer of an interest of the debtor in property" sufficient to bring this transfer within the ambit of 11 U.S.C. § 547(b). If there was no such transfer, there can be no preference. *See In re Grove Peacock Plaza, Ltd.*, 142 B.R. 506 (Bankr.S.D.Fla.1992).

"[T]he definition of 'transfer' under the Bankruptcy Code is comprehensive and includes every conceivable mode of alienating property, whether directly or indirectly, voluntarily or involuntarily." *Criswell, supra,* 102 F.3d at 1415 (citing 11 U.S.C. § 101(54)). Unfortunately, the phrase "interest of the debtor in property" is not defined in the Bankruptcy Code for purposes of analyzing a Section 547 preference action. Other courts that have addressed this dilemma, including the United States Supreme Court, have concluded that "the term 'interest of the debtor in property' under § 547(b) is ... equivalent to the term 'property of the estate' under § 541 and therefore encompasses 'all legal or equitable interests of the debtor in property as of the commencement of the case.' " *Criswell,* 102 F.3d at 1415 (quoting 11 U.S.C. § 541(a)(1)); *see Begier v. IRS,* 496 U.S. 53, 58–59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) ("For guidance, then, we must turn to § 541, which delineates the scope of 'property of the estate' and serves as the post-petition analog to § 547(b)'s 'property of the debtor' "); *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1279 n. 8 (8th Cir.1988) ("Because 'property of the estate' includes 'all legal or equitable interests of the debtor in property ...[,]' § 541(a)(1), 'property of the debtor' as used in the definition of a voidable preference, *see* § 547(b), is for these purposes equivalent to 'property of the estate' ").

SCC does not present any evidence for its claim that an issue of fact surrounds the Committee's allegation that "[a]t least $24,-243.92 paid to SCC in connection with the Direct Payments came from an account maintained by the Debtor at Citibank entitled, 'Corporate Food Mgt. SCC Escrow', Account No. 46970811." *See* note 6, *supra;* Committee's Statement of Undisputed Facts, ¶ 14; *cf.* SCC's Statement of Disputed Facts. When SCC's contradictory positions are sorted out, it appears that SCC is also arguing that Debtor's affiliate, AIC—and not the Debtor—tendered the payment to SCC.

■ A review of the record supports that contention. It is undisputed that the Debtor transfers a payment of $24,243.92 (the sum remaining) from the Escrow Account to AIC on June 9, 1995.[10] Second, there is absolutely no evidence to support the conclusion that these funds were ever placed back into Debtor's possession prior to the payment being tendered to SCC. Third, there is nothing from which to infer that the Debtor tendered this payment to SCC.[11] To the contrary, the check evidencing the payment to SCC clearly bears AIC's account number, thus leading to the conclusion that the payment was made by a third-party and *not* by the Debtor. It is well settled that "[n]o transfer of property of the debtor occurs when a third party pays the creditor directly.... It is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." *In re Grove Peacock Plaza, Ltd.*, 142 B.R. 506, 513 (Bankr.S.D.Fla.1992) (citations omitted).

Curiously, neither party addresses the issue as to whether the June 1995 transfer, made when the Debtor withdrew all the monies from the Escrow Account and transferred them to AIC, was fraudulent, or perhaps a preference. Such an inquiry is critical. *See In re Colonial Realty Co.,* 980 F.2d 125 (2nd Cir.1992). As the Fifth Circuit pointed out in *Criswell,* Section 541 of the Bankruptcy Code defines property of the estate "generally, as including 'all legal or equitable interests of the debtor in property as of the commencement of the case,'

---

10. In addition to being named as the payor, AIC also endorsed the check and listed its bank account number (1824–01390–6) on the back of the check.

11. Indeed, the Debtor has not submitted an affidavit either in support of or, for that matter in opposition to, the pending motion.

before it goes on to include [a]ny interest in property that the trustee recovers under section . . . 550 [the recovery provision for § 547 preferences and §§ 544 and 548 fraudulent transfers]. . . ." *Criswell, supra,* 102 F.3d at 1415. In its *Criswell* decision, however, the Fifth Circuit, relying on its prior decision in *In re MortgageAmerica Corp.,* 714 F.2d 1266 (5th Cir.1983),[12] held that a debtor retains an equitable interest in pre-petition fraudulent transfers not recovered at the time of the preference action for purposes of Section 547(b)'s "interest of a debtor in property." *See Criswell,* 102 F.3d at 1417.

This analysis has been expressly rejected by the Court of Appeals for the Second Circuit. *See In re Colonial Realty Co.,* 980 F.2d 125 (2nd Cir.1992). In *Colonial Realty,* the Second Circuit, relying on the holding in *In re Saunders,* 101 B.R. 303, 304–06 (Bankr. N.D.Fla.1989), held:

> As stated in *Saunders:* "If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions." 101 B.R. at 305. Further, the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph *clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered.*

*Colonial Realty,* 980 F.2d at 131 (emphasis added); *see also In re Maxwell Communication Corp. plc,* 186 B.R. 807 (S.D.N.Y.1995) ("preferential transfers do not become property of the estate until recovered. . . ."), *aff'd,* 93 F.3d 1036 (2d Cir.1996).

■ Upon applying the *Colonial Realty* analysis to the issues raised here, it becomes clear that, until such time as the monies transferred in June 1995 from the Debtor to AIC are determined to be property of the estate, the payment of $24,243.98 to SCC

cannot be held to constitute "an interest of the debtor in property" at the time of the transfer for purposes of Section 547(b), as they were made by third-party funds. *See Colonial Realty, supra,* 980 F.2d at 131; *Saunders, supra,* 101 B.R. at 304–06.

This does not end the inquiry, however. In its affidavit in opposition, SCC questions the extent of the Debtor's control over the funds that were used to make the payment and, for instance, asserts that there are insufficient grounds to conclude that the property of AIC is the property of the Debtor. *See* Schrier Aff., ¶ 28. While not expressly mentioned by SCC, such questions implicate the so-called "earmarking" defense doctrine, which is

> an exception to what would otherwise be a voidable transfer and therefore property of the debtor's estate. The doctrine provides that if property transferred in payment of a debt was never truly within the control of the debtor or subject to the debtor's direction, then a transfer of such property would not be a preference as such assets are not considered property of the estate under § 541 of the Bankruptcy Code. . . . The dispositive question is whether the Debtor had direct control of the funds. . . . Thus, if the Debtor had little or no control over the funds or if the transaction involves a complete substitute of a new creditor for a former creditor, the defense is valid. Conversely, if the Debtor maintains some meaningful control over the funds or actual control over the new creditor's funds, then earmarking is not a defense and the funds become property of the estate.

*Estate of Love v. First Interstate Bank of Montana,* 155 B.R. 225, 230 (Bankr.D.Mont. 1993) (citations omitted); *see also In re Maxwell Newspapers, Inc.,* 151 B.R. 63, 70 (Bankr.S.D.N.Y.1993) ("The dispositive inquiry is whether the debtor had control over the funds").

There is presently no evidence before the Court concerning the nature of the Debtor's

---

12. In *MortgageAmerica,* the Court of Appeals held: "We think that when such a debtor is forced into bankruptcy, it makes the most sense to consider the debtor as continuing to have a

'legal or equitable interest[ ]' in the property fraudulently transferred within the meaning of section 541(a)(1) of the Bankruptcy Code." *Id.,* 714 F.2d at 1275.

affiliation with AIC, much less who controlled its funds at the time of the payment in question. Accordingly, as the Court, on a motion for summary judgment, must draw all ambiguities and reasonable inferences in favor of the non-moving party, there clearly are, at a minimum, questions of material fact regarding (i) which entity had control over the funds which were used to tender the $24,243.92 payment to SCC on August 11, 1995, and, (ii) as a corollary, whether the payment was "an interest of the debtor in property" as of the commencement of the case.

Regardless of which entity had control over the funds, the record shows that the payment in question did not come from the Escrow Account. Accordingly, the parties' lengthy contentions regarding the formation, validity and effectiveness of the "escrow" account need not be discussed here as they are not relevant to any of the issues at hand.

### B. *The $2,000 Payment*

■ A similar analysis applies with respect to the $2,000 payment made to SCC on the Termination Date. Like the other transfer, the $2,000 payment is in the form of an official check, but drawn on a Citibank account instead of one at North Fork. The check bears the name of the Debtor on its face. However, there is an additional notation on the check which reads: "Name of Remitter Marian Vitale; Address 49110569." The "address" appears to be a bank account number. Significantly, like the $24,243.98 check, the address is not the account number of the Escrow Account.

Clearly, there are issues of material fact to be resolved at trial. Among them are an explanation of who "Marian Vitale" is and what her connection is with this case; whether the Debtor exercises any control over Vitale or Vitale's account; whether the ear-

marking defense is applicable; and so on. Accordingly, summary judgment must be denied with respect to the transfer of $2,000 to SCC on the Termination Date.[13]

### C. *The Written Assignment*

As stated above, the elements needed to prove the existence of a preferential transfer, subject to certain exceptions, include "transfers of property that: (1) are made to or for the benefit of a creditor, (2) are made on account of an antecedent debt, (3) are made while the debtor was insolvent, (4) are made within ninety days of the filing ..., and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made." *In re Child World, Inc., supra,* 173 B.R. at 476 (citing *Union Bank v. Wolas,* 502 U.S. 151, 154–55, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)). It is undisputed that the written assignment in question was made for the benefit of SCC while the debtor was insolvent and made within ninety days of the bankruptcy filing. Consequently, at this juncture, the only unresolved issues concern whether the assignment was made on account of an antecedent debt which enabled the creditor to receive more than it would have in a Chapter 7 proceeding absent such a transfer.

SCC contends that this assignment was not on account of an antecedent debt, but was part of a new contract entered into between the Debtor and SCC which allowed the Debtor to use the College's facilities in order to fulfill its remaining non-college commitments. SCC further contends that, in any event, it had a security interest in all of Debtor's personal property and, therefore, would have received the same amount in a Chapter 7 liquidation if the written assignment had not been made.

---

**13.** In its Statement of Disputed Facts, SCC attempts to dispute that the $2,000 payment was on account of an antecedent debt by alleging that it was new consideration for the "right of the Debtor to use the College facilities in furtherance of its continued business." The affidavit of its Vice President, Steven Schrier, who was intimately involved in the transactions in question, clearly attests to the contrary. Specifically, at paragraph 24 of his affidavit, Schrier affirms that the $2,000 was paid "on account of the debt owed ... " and was therefore unmistakably a payment of an antecedent debt. While SCC may contend that this is "new value" within the meaning of 11 U.S.C. § 547(c), such an argument is premature at this stage of the proceeding when SCC's affirmative defenses are not currently at issue.

**1. Did SCC Receive More Pursuant To The Assignment Then It Would Have In A Hypothetical Chapter 7 Liquidation?**

■ SCC first urges that "[t]he parties (the Debtor and the College) fully intended that the contract would create a security interest in the property of the Debtor as between the parties." SCC's Statement of Disputed Facts, ¶ 5. "A security interest is valid and enforceable only if there is evidence of an intent to create or retain a security interest.... The intent of the parties to create a security interest is ascertained by examining the parties' contractual agreement." *Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 669 (Bankr.S.D.N.Y.1985) (citations omitted).

Any analysis must bear in mind that, in a hypothetical Chapter 7 liquidation, a Chapter 7 Trustee's strong-arm powers pursuant to 11 U.S.C. 544(a) [14] allow the trustee to defeat any security interests not properly perfected at the time of the bankruptcy filing. Therefore, to "determine whether a hypothetical lien creditor could obtain a judicial lien on property which is already the subject of a security agreement, the court must ... turn to state law." *O.P.M. Leasing Services, Inc.*, *supra*, 46 B.R. at 669 (citations omitted). Section 9–301 of the New York Uniform Commercial Code ("NYUCC"), the applicable state law provision dealing with unperfected security interests, provides in pertinent part:

**§ 9–301. Persons Who Take Priority Over Unperfected Security Interests; Right of "Lien Creditor"**

(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of

. . .

(b) a person who becomes a lien creditor before the security interest is perfected;

. . .

(3) A "lien creditor" means a creditor who acquires a lien on the property involved by attachment, levy or the like and includes as assignee for benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition....

Accordingly, Section 544 of the Bankruptcy Code, when read together with NYUCC § 9–301, mandate that the Trustee's status as a hypothetical lien creditor is superior to "those security interests which are unperfected as of the filing of the petition." *O.P.M. Leasing Services, Inc.*, *supra*, 46 B.R. at 669.

SCC does not allege that it ever had a properly perfected security interest in Debtor's personal property at the time of the commencement of the bankruptcy case. Rather, SCC simply argues in bald and conclusory fashion that it was the intention of the parties to create a security interest and, as proof of this statement, quotes the language from the underlying contract. Even if it were true that the parties' intended that which SCC asserts, there is absolutely no proof, much less an allegation, that SCC perfected its interest.[15] Accordingly, in a hypothetical Chapter 7 liquidation, SCC would not, and could not, be considered a secured creditor holding a security interest on all of Debtor's personal property, including the funds obtained by the written assignment.

■ A second issue to be addressed is whether SCC received more from the assignment than in a hypothetical Chapter 7 liquidation. In the seminal case of *Palmer Clay*

---

**14.** Section 544 of the Bankruptcy Code provides in pertinent part:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains at such time and with respect to such credit, a judicial lien on all property on

which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; ....

**15.** Indeed, the proof of claim filed in this case by SCC directly contradicts its current position. SCC did not file a secured proof of claim, as it now asks the Court to find, but instead filed an unsecured non-priority claim, thus evidencing that any security interest allegedly existing was non-effectual in this bankruptcy case.

*Products Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936), the Supreme Court set forth the following test:

> Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.

*Id.,* 297 U.S. at 229, 56 S.Ct. 450. "Thus, the section 547(b)(5) evaluation is to be made as of the time the debtor filed its bankruptcy petition." *In re Lan Yik Foods Corp.,* 185 B.R. 103, 108 (Bankr.E.D.N.Y.1995), and cases cited therein. In *Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.),* 778 F.2d 1416 (9th Cir.1986), the Court of Appeals for the Ninth Circuit, following the *Palmer Clay Products* test, further observed:

> This analysis requires that in determining the amount that the transfer "enables [the] creditor to receive," 11 U.S.C. § 547(b)(5) (1982), such creditor must be charged with the value of what was transferred *plus* any additional amount that he would be entitled to receive from a Chapter 7 liquidation. The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, *any* payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.

*Id.* at 1421; *see Lan Yik Foods Corp., supra,* 185 B.R. at 108–09 (quoting *Elliott v. Frontier Properties* with approval).

Although, the record on this motion for summary judgment is barren of evidence supporting or opposing the fact that SCC received more by way of the assignment than it would have in a Chapter 7 liquidation, the Court may take judicial notice of the Debtor's bankruptcy schedules and claims filed in connection with the case. *See Lan Yik Foods Corp., supra,* 185 B.R. at 109. The Debtor's schedules list liabilities totaling $1,184,288.83 and assets totaling $130,720.55. Additionally, the proofs of claim filed in this

case total well over $1,000,000. SCC's proof of claim, as stated above, is for an unsecured debt. Consequently, based on a review of Debtor's schedules and the claims filed in this case, it is readily apparent that unsecured creditors would have received less than a one hundred percent distribution at the time the Debtor converted the involuntary Chapter 7 bankruptcy proceeding to a case under Chapter 11.

Accordingly, utilizing the test set forth in *Palmer Clay Products,* and the reasoning found in *Elliott v. Frontier Properties,* the written assignment enabled SCC, an unsecured non-priority creditor, to receive more from the Debtor than in a hypothetical Chapter 7 distribution. Thus, the Committee has met its burden pursuant to 11 U.S.C. § 547(b)(5).

### 2. Did SCC Receive Payment for an Antecedent Debt?

 The sole remaining element for establishment of a *prima facie* preferential transfer is that the written assignment was "on account of an antecedent debt." Although "antecedent debt" is not defined in the Bankruptcy Code, the term "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). A claim, pursuant to 11 U.S.C. § 101(5), is defined as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. . . .

It is clear that SCC had a claim against the Debtor in connection with the contract. This is evidenced by SCC's proof of claim filed in Debtor's case as well as the termination letter, dated August 11, 1995. The termination letter states that the termination was "necessitated by the lack of response to the account rendered to you in writing on that day and the magnitude of the debt ow-

ing as stated in that account." Committee's Motion for Summary Judgment, Exh. C. Additionally, the written assignment, itself, demonstrates that its execution was on account of this debt owed to SCC. The written assignment states, in relevant part:

> CORPORATE FOOD MANAGEMENT, INC. hereby affirms that CORPORATE FOOD MANAGEMENT, INC. owes SUFFOLK COMMUNITY COLLEGE certain monies pursuant to the terms of the above-described Request for Proposal and the Proposal submitted to and accepted by SUFFOLK COMMUNITY COLLEGE.

*See* Committee's Motion for Summary Judgment, Exh. "E".

SCC's conclusory assertion that the written assignment was part of a "new" contract, and not a payment on account of an antecedent debt, is negated by the evidence currently before the Court, at least in connection with the Committee's *prima facie* case. The record is completely devoid of any reference to this alleged "new" contract, except for one or two lines in SCC's opposition papers. No contract has been produced and no terms have been specified aside from the alleged payment requirements and the written assignment. There simply is no evidence, on the present record, to support the assertion that the written assignment was new consideration for a new contract; SCC has failed to raise a genuine issue of fact. Perfunctory

statements, vague charges and conclusory allegations made in an opposition brief are not enough to defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 586, 106 S.Ct. 1348. In sum, the Committee has met its burden of proof with respect to demonstrating that the written assignment is an avoidable preferential transfer. The Committee's motion for summary judgment, with respect to this transfer, is therefore granted.

Unfortunately, with the shifting burdens of proof so prevalent throughout the Bankruptcy Code, the Committee's success on its motion for summary judgment is, at this juncture, a hollow victory. As noted, "[i]f the debtor [the Committee here] puts forth sufficient proof to establish a *prima facie* preference, the burden shifts and the creditor is given the opportunity to establish by a preponderance of the evidence that one of the enumerated exceptions in 11 U.S.C. § 547(c) applies." *Child World, supra,* 173 B.R. at 476 (citations omitted); *see* 11 U.S.C. § 547(g).

A review of SCC's Statement of Disputed Facts demonstrates that the sole defense to the preference action, with respect to the assignment, concerns the "new value" defenses [16] contained in 11 U.S.C. § 547(c)(1) and (4) [17]. But for its argument, however, SCC

---

**16.** SCC has raised the "ordinary course of business" defense but that is not implicated with respect to the written assignment. *See, e.g.,* SCC's Answer, in which SCC alleges, in its second affirmative defense, the "ordinary course of business" defense with respect to the $24,243.98 and $2,000 payments, but not the assignment. Additionally, the Committee's Statement of Undisputed Facts alleges that the termination notice, the two payments and the assignment were not made in the regular course of Debtor's business. In its Statement of Disputed Facts, SCC alleges that the termination notice and the two payments were made in the regular course of Debtor's business, without mentioning the assignment.

**17.** Section 547 of the Bankruptcy Code provides in pertinent part:
 (c) *The trustee may not avoid under this section a transfer—*
 (1) to the extent that such transfer was—
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was

made to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange; . . . .
 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
 (A) not secured by an otherwise unavoidable security interest; and
 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; . . . .
Additionally, Section 547(a)(2) defines new value as:
 [M]oney or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation. . . .

does not provide any evidentiary support and completely neglects to specify which "new value" defense it is relying upon.[18] Nonetheless, at this juncture, the Court need not determine the sufficiency of SCC's affirmative defense because the creditor has not cross-moved for summary judgment.[19] Accordingly, despite the grant of summary judgment in favor of the Committee with respect to the written assignment, the issues raised by SCC's affirmative defenses must await trial, or properly submitted dispositive motions.[20]

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(F), and venue is proper. This is a core proceeding arising under Title 11.

2. The motion for summary judgment by the Committee, the assignee of the Plaintiff–Debtor, Corporate Food Management, Inc., is denied with respect to the $24,243.98 and the $2,000 transfers, on the basis that material issues of fact exist with respect to whether these transfers were "of an interest of the debtor in property" pursuant to 11 U.S.C. § 547(b).

3. The motion for summary judgment by the Committee as assignee of the Debtor is

granted, solely with respect to the written assignment, and the parties are hereby directed to proceed to trial concerning the affirmative defenses alleged by SCC in connection with the written assignment.

The parties are directed to appear for a pre-trial conference on September 21, 1998 at 10:00 a.m., at which time the Court may schedule a proposed trial date.

Settle Order consistent with this Decision.

---

18. In fact, SCC's contradictory statements concerning the application of the proceeds of the assignment only confuse the issue further. Initially, in the Schrier Affidavit, SCC states that the assignment was on account of the debt owed to it. Schrier Aff., ¶ 24. Then, in its Statement of Disputed Facts, SCC advances a conflicting position, contending the assignment "was part of the new agreement."

19. Although there are vague references in the Schrier Affidavit and upon its legal back to a "cross-motion for summary judgment dismissing the complaint," a fair reading of SCC's papers reveals them to be arguments in opposition in contrast to seeking affirmative relief. In addition, SCC points out numerous issues of fact, thus negating any request for summary judgment. Lastly, it appears that the Committee did not consider SCC's opposition to be a cross-motion as it filed a response, without addressing any of SCC's affirmative defenses.

20. SCC did not raise the "new value" affirmative defenses in its answer to the complaint. Generally, an affirmative defense not raised by an

answer is waived. However, "[i]n the absence of a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment." *In re National Lumber and Supply, Inc.,* 184 B.R. 74, 79 (9th Cir. BAP 1995) (citing *Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993); *Rivera v. Anaya,* 726 F.2d 564, 566 (9th Cir.1984)); *see also United States v. Krieger,* 773 F.Supp. 580, 583 (S.D.N.Y.1991) (failure to plead affirmative defense of illegality did not preclude defendants from raising that defense on motion of summary judgment where plaintiff had adequate time to respond); *Carnley v. Aid to Hospitals, Inc.,* 975 F.Supp. 252, 255 (W.D.N.Y. 1997) ("[C]ourts have allowed affirmative defenses to be raised in summary judgment motions where the party opposing the motion was not prejudiced in its ability to respond"). Because the sufficiency of these defenses are not before the Court at this time, it appears that any prejudice to the Committee would be minimal. SCC will therefore be permitted to amend its answer, within 20 days hereof, to raise any applicable "new value" affirmative defenses. In the event that SCC fails to do so, the defense will be deemed waived.