In re APPONLINE.COM, INC.,
Island Mortgage Network,
Inc., et al., Debtor.

Alan M. Jacobs, as Chapter 11 Trustee of AppOnline.com., Inc., Island Mortgage Network, Inc., Action Abstract, Inc., Action Abstract, Inc., National Settlement Services Corp., Arrowhead Mortgage Company, Inc., Bay City Mortgage Corp., Citizens Mortgage Service, Inc., Cornerstone First Financial, Inc., Queen City Mortgage Co., and Western National Funding, Inc., Plaintiffs,

v.

State Bank of Long Island, Defendant.

Bankruptcy Nos. 800–84686–478, 800–84687–478, 800–85007–478, 801–85195–478 to 801–85202–478. Adversary No. 802–8157–478.

United States Bankruptcy Court,
E.D. New York.

July 28, 2003.

Kramer Levin Naftalis & Frankel LLP, By P. Bradley O'Neill, New York City, for Trustee.

Fried, Frank, Harris, Shriver & Jacobson, By Andrew T. Gardner, New York City, for Defendant.

## DECISION AND ORDER ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON FIRST COUNT OF COMPLAINT

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is a Motion for Summary Judgment (the "Summary Judgment Motion") by Alan M. Jacobs, the Trustee (the "Trustee") of the Substantively Consolidated Chapter 11 Estates of AppOnline.com, Inc. ("AppOnline"), Island Mortgage Network, Inc. ("Island Mortgage"), Action Abstract, Inc. ("Action Abstract"), National Settlement Services, Inc. ("National Settlement") and numerous related entities (collectively, the "Debtors"), seeking a determination that certain banking transactions which occurred on June 5 and June 6, 2000 in the Debtors' bank accounts at State Bank of Long Island ("State Bank") constituted a preferential transfer which may be avoided pursuant to 11 U.S.C. § 547. Also before the Court is State Bank's Cross–Motion for Summary Judgment (the "Cross–Motion") to dismiss the Trustee's preference claim. The Court has considered all submissions, evidence, and arguments relating to this matter, and this decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

The Trustee commenced this adversary proceeding to avoid and recover a transfer of $13,754,706 made by the Debtors on June 6, 2000–six weeks before the commencement of the Chapter 11 cases of AppOnline and Island Mortgage-to State Bank. While the complaint seeks avoidance of this transfer both as a preference (count one) and as a fraudulent conveyance (count two), the instant motions seek summary judgment only on the preference cause of action. At oral argument, the Trustee reduced the amount of his preference claim to $7.3 million.

### BACKGROUND

Prior to the commencement of these bankruptcy proceedings, AppOnline was a holding company that, through its subsidiaries, operated a mortgage banking business. Island Mortgage, a wholly-owned

subsidiary of AppOnline, was a licensed mortgage banker, which originated and sold residential mortgage loans. It solicited applications for such loans through a network of branch offices and a website, AppOnline.com. Most of the mortgage loans that Island Mortgage originated were funded with monies advanced by a number of warehouse lenders under lines of credit with Island Mortgage. Under its agreements with its warehouse lenders, Island Mortgage represented that it would use the funds they advanced to fund the purchases of specifically identified residential mortgages. Island Mortgage agreed that, if those purchases did not close, it would return the funds within a specified period of time.

Action Abstract was a settlement agent and title abstract company that was controlled by Island Mortgage's principals. National Settlement, a wholly-owned subsidiary of Action Abstract, conducted no business operations; its only assets were two bank accounts controlled by Island Mortgage personnel. The remaining Debtors are wholly-owned subsidiaries of AppOnline; each is a former regional mortgage banking company which AppOnline acquired and converted into additional Island Mortgage branches.

On July 19, 2000 (the "Petition Date"), AppOnline and Island Mortgage filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Upon the filing of these cases, AppOnline and Island Mortgage were unable to account for millions of dollars in assets. As a result, three of the warehouse lenders moved for the appointment of an operating trustee, asserting that the Debtors had defrauded them out of tens of millions of dollars in loan pro-

ceeds and that their management could not be trusted to act in the best interests of the estates.[1] Pursuant to Order dated July 28, 2000, the United States Trustee appointed Alan M. Jacobs as Chapter 11 Trustee of the Estates of AppOnline and Island Mortgage.

On July 28, 2000, certain creditors of Action Abstract filed an involuntary Chapter 11 petition against it. On August 22, 2000, this Court entered an order for relief under Chapter 11 with respect to Action Abstract. Pursuant to an Order dated September 19, 2000, the United States Trustee appointed the Trustee as Chapter 11 trustee of Action Abstract. The Trustee filed voluntary Chapter 11 petitions in this Court on behalf of National Settlement and the other AppOnline owned entities.

On July 3, 2001, the Trustee moved for an order substantively consolidating the estates of all of the Debtors for all purposes, *nunc pro tunc* to July 19, 2000, on the ground that, prior to the Petition Date, the Debtors' businesses had been operated as a single consolidated entity and their assets had been hopelessly commingled. On September 7, 2001, the Court entered an order substantively consolidating the estates of AppOnline, Island Mortgage, and the other related debtors.

### FACTS

The facts material to the preference claim are undisputed. Prior to the Petition Date, in February 1999, the Debtors opened 39 bank accounts at State Bank. State Bank agreed at the outset to permit the Debtors to operate all of their State Bank accounts as a so-called "group account," although there was no written

---

1. The actions of the Debtors' principals which led to these bankruptcy filings amounted to a "Ponzi scheme" and resulted in a criminal investigation in which the Debtors' principals pleaded guilty to, among other things, misappropriating $60 million that had been advanced by the warehouse lenders for the purpose of originating mortgage loans.

agreement Among other things, State Bank agreed to permit Island Mortgage to exercise complete control over all 39 accounts, including control over the transfer of monies into and out of the accounts. For purposes of this decision, Island Mortgage will be considered the customer of State Bank.

All funds advanced by the warehouse lenders were wired to an account maintained at State Bank (the "Wire Account") held by a purportedly independent third party-initially by a lawyer named David Duboff, and later, from September 1999 through July 2000, by Action Abstract, which, as noted above, was controlled by principals of Island Mortgage.

Island Mortgage used a single account maintained at State Bank (the "Disbursement Account") to fund all mortgages that it originated. The Disbursement Account was initially an account held by an affiliate named Network National Settlement Corp. ("Network Settlement"). From September 1999 through July 2000, the account was held by National Settlement, which, as noted above, was a wholly-owned subsidiary of Action Abstract. The Disbursement Account was funded by transfers from other Island Mortgage controlled accounts, principally, transfers from the Wire Account.

The Trustee contends that, in the year preceding the bankruptcy filing, State Bank functioned, in effect, as a "lender" to the Debtors in what the Trustee describes as a "non-traditional" lending arrangement. The Debtors, faced with a chronic cash shortfall in the months that preceded the bankruptcy petition notwithstanding the funding they received from their warehouse lenders, asked State Bank for a working capital line of credit in an amount of up to $3 million. It is undisputed that State Bank refused to extend such a credit facility. The Trustee alleges, however, that the Debtors devised an alternative lending arrangement that gave them the benefit of daily advances from State Bank on an overnight basis, but, from State Bank's perspective, eliminated the risk of a traditional loan. This arrangement purportedly gave State Bank the benefit of collecting interest at the prime rate and gave the Debtors the liquidity they needed.

According to the Trustee, the "lending" arrangement worked like this: Every day the Debtors wrote checks on the Disbursement Account to fund mortgage loans in a total amount far in excess of the amount of funds in that account. When these checks were presented for payment, they would give rise to a huge overnight negative balance, usually in the millions of dollars. The Debtors would eliminate the negative balance the next day by transferring funds to the Disbursement Account mostly from monies deposited overnight by the warehouse lenders into the Wire Account and by stopping payment on a very large number of checks.[2] For more than a year,

---

**2.** The checks with respect to which Island Mortgage stopped payment were earmarked for mortgage closings all over the country. The mortgagors or closing agents had agreed to close in exchange for these checks and, at the closings, unsuspecting mortgagors executed notes and mortgages in favor of Island Mortgage as collateral for loans which were not, and would never be, funded. Immediately after the closings, the notes and mortgages were assigned to third parties (the warehouse

lender that had advanced monies for the loan to Island Mortgage), and the mortgages were duly recorded. Sometimes it was weeks before the payees learned that the checks were stopped and the loans unfunded. To add insult to injury, sometimes Island Mortgage issued a second check to replace the original stopped check and then place a stop order on the second check, as well. The object was to give Island Mortgage, which was operating

State Bank permitted the Debtors to continue to incur these large negative balances day after day in exchange for the payment of a "Prime Interest Charge" (described below) and other fees. In the spring of 1999, the parties agreed that State Bank would charge the Debtors a "Prime Interest Charge"(as more fully described below under the caption *"The 'Prime Interest Charge' and Labor Costs Charged by State Bank for Island Mortgage's NSF Activity"*) each day on the amount that the negative balance in the Disbursement Account exceeded the balance in the Wire Account and a monthly labor charge for the increased activity in the accounts. The "Prime Interest Charge" was meant to compensate State Bank for its inability to earn overnight interest on the overnight negative balance. In short, the "Prime Interest Charge" was the cost of State Bank's lost opportunity.

This method of eliminating negative balances continued until June 28, 2000 when the Debtors were unable to fully eliminate the prior day's negative account balance and State Bank refused to honor the checks that Island Mortgage could not cover. Then, on June 30, 2000, the New York State Department of Banking suspended Island Mortgage's license, which precipitated these bankruptcy filings.

Based on these facts and circumstances, the Trustee contends that State Bank received a preferential transfer because (a) on the evening of June 5, 2000, State Bank made a "loan" of approximately $13.8 million to the Debtors at a time when there was a balance of only approximately $7,800 in the Wire Account; and (b) on the morning of June 6, 2000, this "loan" was "repaid" through (i) a preferential transfer of $7.3 million from miscellaneous Island Mortgage accounts maintained at State Bank to the Disbursement Account to cover the negative account balance, and (ii) issuance of $6.5 million in stop payment orders with respect to certain checks presented for payment on June 5, 2000. The Trustee concedes that the stop payment orders in the amount of approximately $6.5 million do not constitute "transfers" for purposes of 11 U.S.C. § 547(b) and, therefore, limits his prayer for damages to the $7.3 million transferred on June 6, 2000 from the Wire Account and other Island Mortgage accounts into the Disbursement Account.

Based on the very same facts and circumstances, State Bank maintains that it made no loan of any kind to the Debtors on June 5, 2000 (or at any other time), and that it received no preferential transfer from the Debtors on June 6, 2000 (or at any other time during the preference period). State Bank denies that Island Mortgage or National Settlement, the nominal owner of the Disbursement Account, ever owed State Bank a "debt," as that term is used in 11 U.S.C. § 547(b), because State Bank never extended credit to National Settlement or any of the Island Mortgage entities by virtue of the negative balance created in the Disbursement Account on June 5, 2000; and that, therefore, the $7.3 million transferred into the Disbursement Account on June 6, 2000 was not the repayment of a "loan" extended on June 5, 2000 to National Settlement or any of the Island Mortgage entities. To support its position, State Bank has presented a comprehensive overview of how New York banks, including State Bank, generally resolve the issue of negative balances that are created when a customer has "not sufficient funds" ("NSF") in its account to satisfy a check presented for payment against such account. Specifically, State Bank offers two affidavits sworn to by

beyond its means, the benefit of the "float" so

as to continue its operations.

David L. Glass, Esq., an acknowledged expert in the area of commercial banking law, to elucidate the practice and procedures followed by New York banks to resolve NSF activity, including how New York Banks charge for NSF activity; i.e., the Glass Affidavit dated November 7, 2002 ("Glass Aff.") and Supplemental Affidavit dated February 4, 2003 ("Glass Supp. Aff."), which include various supporting documents. The Trustee has offered no evidence to contradict the information contained in the Glass Aff. and the Glass Supp. Aff. or any of the supporting documents. Consequently, the Court finds that the following practices and procedures, described by Mr. Glass, are generally followed by New York banks in connection with "NSF" activity in their customers' accounts and, based upon the affidavits of the bank officers at State Bank responsible for the Island Mortgage accounts (which are also not controverted), were followed in the case of the National Settlement Disbursement Account:

***How New York Banks (Including State Bank) Generally Resolve "NSF" Activity:***

1. When a customer "draws" a check on its account with State Bank, that customer is considered the "drawer" of that check, and the account on which the check was drawn is referred to as the "drawer's account."

2. A check is the drawer's order to State Bank to pay to the payee the amount specified in the order. The bank would generally have no knowledge that the check has been drawn by the drawer, no knowledge of the amount of the check, and no knowledge of the identity of the payee on the check, until that check has reached the bank through the presentment process.

3. The presentment process is the path through which the check drawn by the drawer on its account at State Bank travels from the bank at which the payee on that check deposited the check, through any correspondent banks, and on to the New York Federal Reserve Bank ("N.Y.Fed"), which then "presents" the check to the bank for payment.[3]

4. Each night every bank's accounts with the N.Y. Fed is debited an amount that is the sum of all checks presented at the N.Y. Fed on all of the bank's accounts earlier that day, minus any corresponding credits to which the bank is entitled.

5. State Bank has a reserve account with the N.Y. Fed,[4] and upon the N.Y. Fed "presenting" that check to State Bank, the amount of that check is deducted from State Bank's account with the N.Y. Fed. The deduction from State Bank's account with the N.Y. Fed happens *automatically,* as a result of computerization; *there is no*

---

**3.** Checks can also be presented through a clearing house such as, (for State Bank), the Northeast Regional Check Exchange, and State Bank itself can be the "presenting bank" in those instances in which the check was both drawn on and deposited to an account maintained at State Bank (an "on us" check). In those circumstances, however, just as where the N.Y. Fed is the presenting bank, the basic presentment process is the same. In all three situations, there is an automatic provisional debit from the drawer's account upon presentment of the check, and that debit is subject to being reversed by State Bank in the event that (a) the drawer's ac-

count has insufficient funds to cover the check that has been drawn, and (b) State Bank chooses not to allow an overdraft to be created. For ease of illustration, the Court refers to all checks as being presented through the N.Y. Fed.

**4.** All banks are required by law to maintain reserves with the Federal Reserve as a percentage of their deposits. Most banks maintain an account with their local Federal Reserve Bank (the "reserve account"), which is used by banks as a payment account through which payments to other banks are effected.

*human judgment involved whatsoever.* Moreover, up to this point there has been no opportunity for State Bank to determine whether there are actually sufficient funds in the drawer's account to cover the check that the N.Y. Fed has just presented to State Bank. Thus, the debit from State Bank's account is subject to being reversed.

6. Under various provisions of the Uniform Commercial Code, the presentment of the check by the N.Y. Fed to State Bank triggers the commencement of a period within which State Bank must decide whether the provisional debit from its account with them will be allowed to become final, or whether instead State Bank will instruct the N.Y. Fed to reverse the transaction.

7. Under UCC §§ 4–104(h), 4–213 and 4–301, State Bank's deadline in this regard is midnight of the banking day after the check was presented to State Bank by the N.Y. Fed. For example, if the check was presented by the N.Y. Fed to State Bank and debited from State Bank's account on a Wednesday, State Bank has until midnight of the next banking day-Thursday-to determine whether to have the debit reversed. This is referred to in the banking industry as the *"midnight deadline."*

8. If State Bank returns the check on Thursday, its account at the N.Y. Fed is automatically credited on that day and State Bank is "made whole" at the N.Y. Fed (except with respect to its lost opportunity to earn overnight interest with respect to monies debited from State Bank's account due to the NSF activity). It is the awareness of this "midnight deadline" for reversing debits that formed the way State Bank processed checks in the 24 hours following presentment.

9. On the evening of the day that the check has been presented by the N.Y. Fed to State Bank, State Bank debits the drawer's account for the full amount of that check.

10. Just as with the debiting of State Bank's reserve account in regard to that same check, this debiting by State Bank of the drawer's account for the full amount of that check is (a) done by computer *automatically,* without any "judgment" involved; (b) done *without regard to whether the drawer has sufficient funds on deposit at that time to cover the check;* and (c) *provisional*—that is, subject to being reversed under various circumstances (as described more fully below).[5]

---

**5.** The Trustee asserts that the Expedited Funds Availability Act (12 U.S.C. § 4001 et seq.) (the "Act") and Regulation CC (12 CFR Part 229) promulgated thereunder by the Board of Governors of the Federal Reserve System, preempts certain provisions of Article 4 of the Uniform Commercial Code, including the "midnight deadline" established under UCC §§ 4–301 and 4–302 and the concept of provisional settlement as between a payor bank and its customer. Regarding the concept of provisional debiting, the Act and Regulation CC supplant the UCC's provisional settlement regime and makes settlement final as between banks in the collection chain. *The Act and Regulation CC do not affect in any way the relationship between the payor bank and its customer. In particular, they*

*did not change the nature of the settlement for checks presented to the payor bank for payment, which remains provisional unless and until the bank chooses to honor the check or the midnight deadline lapses.* Additionally, *the "midnight deadline" under the UCC has not been preempted by Regulation CC, and continues to set the time frame for all banks to determine whether or not to honor a check drawn by a customer and provisionally debited from the customer's account.* See Official Commentary on Regulation CC, which states that Regulation CC "does not relieve a paying bank from the requirement for timely return (i.e., midnight deadline) under UCC §§ 4–301 and 4–302, which continue to apply." Reg. CC Commentary Section 229.30(a)(9), IV FRRS ¶ 9–364–1. *See also*

11. If the amount of the check presented and provisionally debited was greater than the amount of funds then on deposit in the drawer's account, that account will automatically reflect a negative balance as of the end of that banking day.

12. It is inaccurate to characterize that negative balance as an "overdraft." Rather, that negative number reflects that the drawer's account is now in an NSF position, and whether that NSF position in fact develops into an actual overdraft (i.e., an extension of credit by State Bank to the drawer) or instead is resolved in another way depends on what the drawer and State Bank do in the period between creation of the NSF position and expiration of the midnight deadline.

13. State Bank, as do most or all New York banks, closely monitors all NSF activity in its customers' accounts. This is done for a variety of reasons, the most important of which is that if (and only if) no action is taken by State Bank between the creation of an NSF position and the expiration of the midnight deadline, the provisional charge to State Bank's account at the N.Y. Fed becomes final. At that point, the NSF position ripens into an overdraft.

14. State Bank monitors NSF activity through use of a "referral screen" that is viewed by the account officer with responsibility for the drawer's account. On the morning after creation of an NSF position in the drawer's account, the referral screen viewed by the account officer lists the drawer's account and identifies the cause and extent of the NSF position. Kevin Hennessy, a Vice–President of State Bank, was the officer responsible for resolving NSF items in any Island Mortgage Account, including the National Settlement Disbursement Account. (Hennessy Aff. ¶ 18). Over the course of the morning, Mr. Hennessy was responsible for determining how that "referral item" would be "decisioned" or "resolved." Each NSF item can be resolved in one of four ways, as set forth below:

a) *Resolution # 1—Customer Covers the Check with Good Funds:* The customer can eliminate the NSF position simply by depositing/transferring sufficient funds into the account in question that morning (i.e., the morning after the NSF is created). Because the check has now been "covered" with good funds, State Bank allows the midnight deadline to pass, and the provisional debit from State Bank's account with the N.Y. Fed becomes final.

b) *Resolution # 2—Customer Stops the Check:* The customer can eliminate the NSF position on the morning after the NSF position was created by instructing State Bank to stop payment on the check.[6] When that occurs, State Bank stamps the check "Payment Stopped," returns the check to the N.Y. Fed that afternoon, and the provisional debiting of State Bank's account in connection with that check is automatically reversed. The N.Y. Fed, in turn, presents the dishonored check back to the bank that had presented it to the N.Y. Fed, and so on through the collection

Bailey & Hagedorn, *Brady on Bank Checks* ¶ 25.09 fn. 121 ("The midnight-deadline limits for return of an unpaid check by the paying bank under UCC §§ 4–301(1) and 4–302(a) are expressly continued under Regulation CC.")

6. A customer can stop payment on a check at any time up until the earlier of the expiration of the midnight deadline or until the bank on which the check was drawn has completed the process of posting that check to the customer's account. UCC § 4–403(1). If a bank does not complete that process until midday of the day after an NSF position is created (as was the case with State Bank), the bank's customers clearly can stop payment on checks the morning after an NSF position is created.

chain, until the check is presented back to the payee's original bank of deposit. At that point, any provisional credit the payee might have received while the check was in the collection chain is reversed. Thus, in the "stop payment" scenario, no overdraft arises, and State Bank is never exposed to the risk of loss on that item.

c) *Resolution # 3—State Bank Bounces the Check:* Only if the customer has not eliminated the NSF position by covering the shortfall or stopping the check will State Bank be required to make a credit decision. At that point, State Bank must decide whether to allow the midnight deadline to pass without returning the check to the N.Y. Fed for insufficient funds. If State Bank permits the midnight deadline to pass, whether by affirmative choice or by inaction, the NSF position will mature into an actual overdraft (an extension of credit to the drawer). Where State Bank is unwilling to take on the credit risk, it bounces the check; i.e., State Bank stamps the check "Insufficient Funds," returns the check to the N.Y. Fed that afternoon, and the provisional debiting of State Bank's account in connection with that check is automatically reversed. When State bank elects to bounce a check because of insufficient funds, there is no overdraft created.

d) *Resolution # 4—State Bank Allows an Overdraft to Occur.* State Bank may decide to allow the midnight deadline to pass without returning the NSF check to the N.Y. Fed. Such a decision is made by the account officer with responsibility for resolving the item that appeared on his referral screen. Permitting the midnight deadline to pass in this manner amounts to an extension of credit to State Bank's customer. Only at this point is the negative balance in the account properly characterized as an "overdraft."

### How State Bank Resolved the NSF Position in the Disbursement Account:

Early in the deposit relationship between State Bank and the Island Mortgage entities, State Bank noted that Network Settlement (which maintained the Disbursement Account prior to National Settlement) was stopping payments on checks more frequently than State Bank had previously experienced with other customers. (Scheriff Aff. ¶ 4). Thus, in April 1999, officers of State Bank met with representatives of Island Mortgage and with State Bank's counsel to discuss and assess the reasons underlying the stop payment orders. (Scheriff Aff. ¶ 4). At this meeting, Island Mortgage explained (a) that it typically borrowed money from its lenders as late in the process as possible in order to minimize its interest expenses with respect to those monies; (b) that the reasons for the stops primarily related to documentation errors made by other parties participating in the relevant mortgage closings nationwide; (c) that payment on the checks associated with a "bad" closing would be stopped so that Island Mortgage could get the documentation correct (which was important to its ability to sell the loan); and (d) that once the documentation errors were corrected, Island Mortgage caused a replacement check to be issued. After consultation with its counsel, State Bank concluded that the explanation appeared to be reasonable, and it continued to process the account as outlined herein.

State Bank indicates that it took additional comfort from the fact that Island Mortgage was regulated by the New York State Banking Department and by the Securities and Exchange Commission (because its parent entity, AppOnline, was publicly traded), and appeared to be a highly successful and well-regarded company. (Scheriff Aff. ¶ 7). It was not until approximately June 2000 when, among

other things, the volume of stop order instructions "suddenly increased dramatically" that State Bank began to become concerned that there might be a problem at Island Mortgage. (Yovine Aff. ¶ 11).

Kevin Hennessy, a Vice–President of State Bank and the account officer responsible for resolving NSF items in the Disbursement Account, knew that State Bank had made a decision before the commencement of the banking relationship with Island Mortgage not to extend credit to Island Mortgage or any of its affiliates. (Hennessy Aff. ¶ 20). He also knew that allowing an overdraft to occur in the Disbursement Account based on an assertion that monies would ultimately be coming in to Island Mortgage to make those checks good would be a method of extending unsecured credit to Island Mortgage. (Hennesy Aff. ¶ 20). Consequently, he "was neither authorized nor inclined to extend credit to [Island Mortgage]." (Hennessy Aff. ¶ 21).

In late 1999, the Federal Deposit Insurance Corporation (the "FDIC") began conducting a periodic examination of State Bank for the period ending September 30, 1999. During said examination, the FDIC focused on the NSF activity in the Network Settlement Account (the account used by Island Mortgage at that time for disbursements of mortgage proceeds), and asked to examine documents with regard thereto. State Bank answered the FDIC's questions and made all requested documents available for review. The FDIC Report of Examination concluded that in the Network Settlement Account there were "numerous daily stop payments; subsequent return of checks; and daily substantial negative balances, *though not a true overdraft.*" (Glass Aff.—Exh. A, p. 6, emphasis supplied). Later in the same Report, the FDIC noted: "The business conducted by these entities includes numerous daily stop payments and returns of checks issued on the account. The account also reflects daily substantial negative balances, which are reported as overdrafts but which, in actuality, *are not true overdrafts as bank funds are not advanced until the depositor(s) provides sufficient funds via daily wire transfers.*" (Glass. Aff—Exh. A, p. 26, emphasis supplied).

***The "Prime Interest Charge" and Labor Costs Charged by State Bank for Island Mortgage's NSF Activity:***

The National Settlement Disbursement Account was extremely labor intensive in light of the NSF activity, the stop payment activity and a regular and heavy flow of outgoing wires. (Hennessy Aff. ¶ 29). The Wire Account was also highly active and, therefore, particularly labor intensive. (Hennessy Aff. ¶ 29). State Bank chose to continue servicing this customer instead of refusing to accept voluminous checks which clearly were subject to stop payment orders or "midnight deadline" decisions. Instead, State Bank and Island Mortgage agreed on billing arrangements specific to the activity in the Wire Account and the National Settlement Disbursement Account (and before it, the Network Settlement Account).

New York banking regulations permit banks to charge their customers $25 for every item that is NSF as of the moment of presentment (the "Regulatory NSF Fee"). With large corporate relationships, however, State Bank rarely if ever charged those customers the Regulatory NSF Fee for NSF activity. (Hennessy Aff. ¶ 30). Rather, State Bank devised an "Alternative NSF Fee" through a formal Alternative NSF Fee calculation agreed to by the parties.

Specifically, instead of imposing a flat fee for each NSF item, State Bank charged Island Mortgage an Alternative NSF Fee that the bank derived by taking

the balance in the Wire Account at the end of each day and deducting from it any NSF position in the National Settlement Disbursement Account (and before it, the Network Settlement Account). If the NSF position was greater than the balance in the Wire Account, State Bank charged Island Mortgage a "Prime Interest Charge" that was applied to the difference between the two accounts. Despite the label, the "Prime Interest Charge" was not the result of any advance of funds from State Bank to National Settlement or any other Island Mortgage affiliate. Rather, to the extent that the National Settlement Disbursement Account was NSF on a given night, State Bank's reserve account at the N.Y. Fed was reduced by the amount of that NSF position; i.e., monies that otherwise would have been on deposit in State Bank's account with the N.Y. Fed were instead deducted from that account due to the NSF position. Because State Bank is required to maintain reserves with the N.Y. Fed that, over a two week period, average out to the reserve requirement stipulated by the N.Y. Fed against State Bank's total deposits (10% against demand deposits), to the extent that its overnight reserve balance is reduced by an NSF item, it will have to make up that shortfall by borrowing at some point in the course of the two week cycle. Accordingly, an NSF item imposes an "opportunity cost" on State Bank because it creates a shortfall in the bank's reserve account at the N.Y. Fed. The "Prime Interest Charge"

reflected State Bank's business decision to calculate the amount of the NSF fee based upon the prime rate of interest.[7] Contrary to the Trustee's assertion, merely because prevailing interest rates are used in computing this type of charge to its customers is not evidence that a loan was made.

State Bank also charged Island Mortgage a labor charge of $3,500 per month in connection with NSF activity.[8] According to Peter Yovine, Branch Manager of the Farmingdale Branch of State Bank, the labor charge was derived by looking at the magnitude of the dedication of resources at the Farmingdale branch (where the Island Mortgage accounts were maintained), including the amount of time spent on the telephone with Island Mortgage personnel answering questions and taking instructions regarding those accounts, the amount of time spent monitoring the posting of incoming wires, the amount of time spent sending outgoing wires, and the amount of time spent processing stop payment instructions. (Yovine Aff. ¶ 3).

The Court finds that the foregoing policies and procedures followed by State Bank in connection with the Island Mortgage accounts were consistent with New York banking procedures and policies.

The Court finds that the debit from the Disbursement Account on June 5, 2003 as a result of presentment of National Settlement checks for payment was not "final payment" under UCC § 4–213,[9] but, in-

---

7. The Trustee alleges in the adversary complaint that the Debtors paid State Bank more than $140,000 in "Prime Interest Charges" over the period in question. (Complaint, ¶ 23). State Bank has denied all of the allegations in paragraph 23.

8. The Trustee alleges in the adversary complaint that the Debtors paid State Bank a total of $49,000 in labor charges prior to the Petition Date. (Complaint, ¶ 23). State Bank has denied all of the allegations in paragraph 23.

9. UCC § 4–213(1)(d) provides: "An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first: (a) paid the item in cash; or (b) settled the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or (c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or (d) made a provisional

stead, a provisional settlement between State Bank and its customer which could be revoked before the midnight deadline provided for under UCC § 4–301(1).

The Trustee has not produced a written loan agreement, note or other document evidencing a loan by State Bank to Island Mortgage or any of its affiliated entities. The Court finds that the "Prime Interest Charge" imposed by State Bank in connection with the NSF items does not, by itself, conclusively establish that a loan was made to Island Mortgage.

### ISSUES PRESENTED

1. Whether State Bank extended credit or made a loan to Island Mortgage in connection with the $13.8 million in checks presented for payment on June 5, 2000, when there were not sufficient funds in the Disbursement Account to honor such checks.

2. Whether the $7.3 million transferred by Island Mortgage from (primarily) the Wire Account into the Disbursement Account on June 6, 2000, to partially cover the negative account balance created on June 5, 2000, constituted the repayment of a "debt" for purposes of 11 U.S.C. § 547(b)(2).

3. Whether the "Prime Interest Charge" constituted interest on a "loan" from State Bank to Island Mortgage.

4. In the event the Court can determine, as a matter of law, that a debt

existed by virtue of the negative balance created in the Disbursement Account on June 5, 2000, whether the payment of funds from certain Island Mortgage bank accounts to the Disbursement Account was a transfer to or for the benefit of State Bank for purposes of 11 U.S.C. § 547(b).

5. In the event the Court can determine, as a matter of law, that Island Mortgage owed a debt to State Bank by virtue of the negative balance created in the Disbursement Account on June 5, 2000, whether State Bank received more than it would have received in a Chapter 7 case.

6. In the event the Trustee establishes an avoidable preference, whether State Bank was the "initial transferee" of Island Mortgage or the "entity for whose benefit such transfer was made," and, therefore, an entity from whom the Trustee may recover for purposes of Section 11 U.S.C. § 550(a).

7. In the event the Court can determine, as a matter of law, that Island Mortgage owed a debt to State Bank by virtue of the negative balance created in the Disbursement Account on June 5, 2000, whether State Bank's affirmative defenses of "contemporaneous exchange for new value" and "ordinary course" defeat the Trustee's preference claim.

### DISCUSSION

#### I. The Summary Judgment Standard.

Pursuant to Fed.R.Civ.P. 56, which is made applicable to bankruptcy proceed-

---

settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement."

Official Comment 4 to UCC § 4–213 provides, in pertinent part: "If at the time of settlement the payor bank reserves a right to revoke the settlement, the settlement is provisional.... A primary example of a statutory right on the part of the payor bank to revoke a settlement is the right to revoke conferred by Section 4–301. The underlying theory and

reason for deferred posting statutes (Section 4–301) is to require a settlement on the date of receipt of an item but to keep that settlement provisional with the right to revoke prior to the midnight deadline. In any case where Section 4–301 is applicable, any settlement by the payor bank is provisional solely by virtue of the statute, subsection (1)(b) of Section 4–213 does not operate and such provisional settlement does not constitute final payment of the item."

ings by Fed. R. Bankr.P. 7056, the Court will grant summary judgment only in the absence of any material issue of fact, so as to make the movant entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Material facts" are those which might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing summary judgment has raised a genuine issue of material fact when the record taken as a whole could lead a rational finder of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party moving for summary judgment has the burden of showing that no genuine issue as to a material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

In the case at bar, the plaintiff and the defendant have each moved for summary judgment, asserting that the evidence before the Court offers a complete factual picture of the transactions between State Bank and the Island Mortgage entities on June 5 and June 6, 2000, and that nothing additional need be brought before the Court in order for it to determine the preference claim. The Court agrees that no issues of material fact have been raised by either party.

In order to recover from State Bank, the Trustee would have to establish two things. First, he would have to establish that there was a preferential transfer pursuant to Section 547(b). After making this showing, the Trustee would have to prove that State Bank is a party from whom he may seek recovery under Section 550.

## II. *State Bank Did Not Extend Credit to Island Mortgage on June 5, 2000.*

Section 547(b) of the Bankruptcy Code provides as follows:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made—
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables such creditor to receive more than such creditor would receive if—
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). In order to prevail on a preference action, a plaintiff must establish that there was an "antecedent debt" owed by the debtor before the transfer sought to be avoided was made. In this case, the Trustee alleges in the complaint and in the Summary Judgment Motion that the NSF position in the Disbursement Account on June 5, 2000 "reflected an ac-

tual overnight advance of funds to the Debtors." However, the Trustee does not offer a loan agreement, note or other instrument or document to support this assertion. In addition, the availability of the reverse mechanism provided for in UCC § 4–301(1) enabled State Bank to avoid providing an advance of funds, or loan, to the Debtors. Since no funds were advanced, there was no "antecedent debt" to be paid.

 Pursuant to Section 101(12) of the Bankruptcy Code, a "debt" means a liability on a claim. Pursuant to Section 101(5), a "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5). The validity of a creditor's claim is determined by rules of state law. *Grogan v. Garner,* 498 U.S. 279, 283–84, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.") Island Mortgage, which had control of all 39 bank accounts maintained by its affiliates at State Bank, is a New York corporation, and all of the Debtor entities had the same principal place of business in Melville, New York. State Bank is a New York banking corporation. Consequently, New York law is the relevant state law to determine whether State Bank had a prepetition claim against the Debtors.

 Under Article 4 of the New York Uniform Commercial Code and various banking regulations, a debit from a payor bank's account at the N.Y. Fed as a result of the presentment of a check is provisional only-it can be reversed. If the amount of the check presented and provisionally debited was greater than the amount of funds then on deposit in the drawer's account, that account will automatically reflect a negative balance as of the end of that banking day. The negative balance is not an overdraft, but merely reflects that the drawer's account is in an NSF position.

Clearly, an NSF position was created on June 5, 2000 when there were insufficient funds in the National Settlement Disbursement Account to honor the checks which came on for presentment on that date, and the Disbursement Account automatically reflected a negative balance as of the end of that banking day. However, under New York banking policies and procedures, that negative balance did not represent an overdraft, but reflected that the Disbursement Account was in an NSF position. It is undisputed that, before the midnight deadline on June 6, 2000, Island Mortgage resolved all of the NSF items by a combination of stopping certain checks and by transferring funds from various of its other accounts maintained at State Bank-primarily the Wire Account-into the Disbursement Account. Thus, no overdraft occurred in the Disbursement Account.

The Court cannot find, based on these facts and circumstances, that State Bank extended credit or made a loan to Island Mortgage. In fact, the evidence before the Court specifically demonstrates the opposite. State Bank personnel took extra care to ensure that the NSF items in the

Disbursement Account never became final before the midnight deadline.[10] Indeed, since so much of State Bank's manpower was dedicated to this purpose it is not unreasonable that Island Mortgage was charged $3,500 per month as a fee for labor charges.

The Court also notes that the FDIC did not consider this practice to create an overdraft after conducting its examination of State Bank in 1999.

The facts in the case at bar bear close resemblance to the facts in *Nordberg v. Societe–Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir.1988). In *Chase & Sanborn,* the bankruptcy trustee for the estate of Chase & Sanborn attempted to avoid as a fraudulent conveyance a pre-petition $500,000 wire transfer from Chase & Sanborn's account at Credit Lyonnais Panama into Columbian Coffee Corp.'s account at Societe Generale, a French Bank with a branch office located in New York City. As part of its deliberations, the Eleventh Circuit explored the intricacies of the Clearing House System as it related to Societe Generale. The presentment process used by the New York Clearing House is basically the same as it is in the case at bar, where the N.Y. Fed is the presenting bank. As the Eleventh Circuit explained:

> All checks drawn on accounts established with Societe Generale in New York must be processed through the New York Clearing House ("clearing house") system. When a check drawn on a Societe Generale account arrives at the clearing house for payment, Citibank, Societe Generale's clearing bank, pays the checks and debits Societe Generale's account by that amount. Citibank does this automatically, without considering the status of the account on which the check is drawn.

> If there are insufficient funds to cover a check drawn on the account, the payment of the check automatically creates an overdraft on paper. In reality, however, Societe Generale has taken no action regarding the check at this point. Societe Generale actually has until noon on the following business day to inform the clearing house whether it will honor or return the check. Societe Generale's internal rules require account officers to reach a decision by 10 a.m., so that it can meet the clearing house's noon deadline.

> \* \* \* \* \* \*

> Some Societe Generale accounts have special provisions that allow the account holders to write checks for which there are insufficient funds. If such a check is presented to the bank, the bank will automatically honor it despite the overdraft it creates in the account. Colombian Coffee [Chase & Sanborn's transfer-

**10.** The Trustee opines that most banks would not permit a customer to run up a multi-million dollar negative balance day after day for over a year. (Tr. 2/11/03, p. 9). He argues that most banks would do what State Bank finally did on June 28, 2000, when the Debtors were unable to fully eliminate the prior day's negative account balance-bounce all the checks in the Disbursement Account. (Tr. 2/11/03, pp. 9–10). While the Court may agree with the Trustee's assessment of the situation (which evolved through hindsight after a full investigation of the Debtors' fraudulent financial scheme), it is not germane to the preference analysis, which concerns whether the transfers in question reduced the value of the Debtors' estates and, thus, the net return to creditors as a group. *See, e.g., Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 892 (7th Cir. 1988). As no overdraft was permitted to occur, State Bank did not extend credit prepetition to Island Mortgage. Therefore, the payment of $7.3 million of NSF items on June 6 did not result in repayment of a debt to State Bank which inured to the detriment of the unsecured creditors.

ee], however, did not have any such understanding with Societe Generale regarding its overdrafts. Instead, because Societe Generale was aware of Colombian Coffee's financial difficulties, it monitored Columbian Coffee's account quite closely. Whenever Societe Generale became aware of an overnight overdraft, it first called Colombian Coffee to make sure that they were depositing sufficient funds to cover the check. Colombian Coffee would tell Societe Generale how much money was on the way and which bank was sending the money. Societe Generale would then contact the bank, which would confirm the information by telex or by telephone. It was only after receiving a confirmation from the bank in question that Societe Generale would honor the check.

\* \* \* \* \* \*

On November 29, 1982, a check for $1,747,403.00, drawn on Colombian Coffee's account with Societe Generale and payable to Banco Popular Bogota ("Banco Popular"), arrived at the clearing house for payment. Payment of the check created an automatic overdraft of $1,033,135.07 in the Colombian Coffee account.

When Societe Generale learned of the overdraft, it presumably followed its customary procedure and checked with Colombian Coffee to find out whether they were depositing sufficient funds to cover the check. Colombian Coffee apparently informed the bank that two wire transfers were coming from Credit Lyonnais Panama-one for $500,000 [the transfer at issue], and another for $700,000. A corporate assistant at Societe Generale prepared an internal advice indicating that the money was indeed being transferred into the Colombian Coffee account by Credit Lyonnais and recommending that, be-cause of this transfer, the bank should honor the check.

At the time that Societe Generale honored the check, however, the wire transfer had not yet arrived at the bank. Thus, Societe Generale listed an overdraft in Colombian Coffee's account from November 29, until November 30. Societe Generale charged Colombian Coffee's account for this overdraft for the day of November 29, at a rate of 12.25% per annum. The charge amounted to $351.51. . . .

A credit ticket recording the wire transfer indicates that Societe Generale received the funds from Credit Lyonnais shortly after 4:00 p.m. on November 30. The funds came from [Chase & Sanborn's] account with Credit Lyonnaise. Approximately six months later, [Chase & Sanborn] filed for bankruptcy.

*Chase & Sanborn,* 848 F.2d at 1197–98. The bankruptcy court in *Chase & Sanborn* had concluded that the transaction at issue did not create a real debt. The Eleventh Circuit framed the issue on appeal as follows:

If we determine that the paper overdraft created by the events of November 29 and November 30 constituted a *debt* owed to Societe Generale by Colombian Coffee, then the money wired to Societe Generale-for the express purpose of paying off the overdraft-would actually have been sent to Societe Generale. If this is the case, then Societe Generale had actual control of the funds when it received the money from [Chase & Sanborn], and [the trustee] can recover the money from the bank. If, on the other hand, there was no real debtor-creditor relationship, then the bank merely deposited the funds into Colombian Coffee's account, and Colombian Coffee used that money to pay the check to Banco Popular.

*Id.* at 1200–01 (emphasis in original). The Eleventh Circuit affirmed the bankruptcy court's determination that there was no debtor-creditor relationship between Colombian Coffee and Societe Generale, stating: "We do not believe that, in this situation, Societe Generale viewed itself as a creditor that had loaned over a million dollars to Colombian Coffee." *Id.* at 1201.

To treat the NSF position in the Disbursement Account as an extension of credit flies in the face of banking law and practices, as well as common sense. Any debtor-creditor relationship can only arise with the consent of both parties. If a bank wishes to permit an account holder to write checks in excess of its balance, it does so by providing an overdraft facility. In such a case, the bank has consented in advance to honor checks presented in excess of the balance of the account, up to a specified limit, and a debtor-creditor relationship arises when the customer overdraws the account pursuant to the terms of the overdraft facility.

By contrast, in this case, State Bank specifically declined to provide any type of credit facility to Island Mortgage. It honored the $7.3 million of checks that cleared on June 6 because-and only because-$7.3 million had been deposited in the Disbursement Account to fund those checks, all unfunded checks were dishonored. This is not an extension of credit by a bank to its customer, nor was there a debtor-creditor relationship established by these facts.

If the concept of provisional settlement as between the bank and its customer were eliminated, stop payment orders, garnishments and set-offs would all be ineffective if they arrived at the payor bank after forward settlement has been made with its presenting bank but before the payor bank has determined whether or not to honor the check, and the concept of the midnight deadline would, in effect, cease to exist. As noted in Official Comment 5 to UCC § 4–301: "Obviously the section [4–301] assumes that the item has not been 'finally paid' under Section 4–213(1). If it has been, this section has no operation." *See also* the Official Commentary on Regulation CC, which states that Regulation CC "does not relieve a paying bank from the requirement for timely return (i.e., midnight deadline) under UCC §§ 4–301 and 4–302, which continue to apply." Reg. CC Commentary Section 229.30(a)(9), IV FRRS ¶ 9–364–1. *Accord,* Bailey & Hagedorn, *Brady on Bank Checks* ¶ 25.09 fn. 121 ("The midnight-deadline limits for return of an unpaid check by the paying bank under UCC §§ 4–301(1) and 4–302(a) are expressly continued under Regulation CC.")

■ If the Trustee's theory were to prevail and the well-settled concepts of "provisional settlement" and the "midnight deadline" provided for in UCC §§ 4–213, 4–301 and 4–302(a) were eviscerated by a bankruptcy trustee's avoidance powers, the policy favoring the ready negotiability of checks and other instruments would affect the movement of checks along the highway of commerce. The trustee's avoidance powers should not have the unintended consequences of frustrating the purposes of Article 4 of the Uniform Commercial Code, state statutes and Regulation CC. In the event that the facts of a case indicate other factors where knowledge and intent to defraud are shown, the conclusions may be different. In regard to the question of preferential payments, intent is not at issue. *See, e.g., Cullen Center Bank & Trust v. Hensley (Matter of Criswell),* 102 F.3d 1411(5th Cir.1997), where the Fifth Circuit stated:

> [T]he underlying theory for voiding preferences must be distinguished from the rationale for voiding fraudulent

transfers: "A preference is an infraction of the rule of equal distribution among all creditors; a fraudulent transfer goes further, and by it the debtor seeks through deceitful means to secure a personal advantage out of what in law should belong to creditors and not to the debtor." Accordingly, neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b).

*Matter of Criswell*, 102 F.3d at 1414 (quoting Lawrence P. King, ed., 4 Collier on Bankruptcy ¶ 547.01, at 547–12–547–13 (15th ed.1996)). *See also In re Corporate Food Management, Inc.*, 223 B.R. 635, 641 (Bankr.E.D.N.Y.1998).

### III. *The "Prime Interest Charge" Did Not Constitute Interest on a "Loan.".*

 The Trustee asserts that, although no loan agreement, note or other instrument or document exists to evidence a loan, nonetheless, the arrangement entered into between Island Mortgage and State Bank was tantamount to a lending relationship. He offers as evidence of a loan only the fact that Island Mortgage agreed to pay "interest" to State Bank. Actually, the so-called "Prime Interest Charge" represented reimbursement to State Bank for loss of the use of funds in its reserve account at the N.Y. Fed during the overnight period between the provisional debit from the Disbursement Account and the actions taken before the midnight deadline on the following day. That is to say, to the extent that the Disbursement Account was NSF on a given night, State Bank's reserve account at the N.Y. Fed was reduced by the amount of that NSF position, and State Bank was required to make up the shortfall by borrowing from another source or from the N.Y. Fed. Thus, an NSF item imposed an "opportunity cost" on State Bank.

New York banking institutions are permitted to charge their customers a Regulatory NSF Fee of $25 for every item that is NSF as of the moment of presentment. Instead, State Bank chose an NSF fee calculated as the "Prime Interest Charge." The "Prime Interest Charge" reflected State Bank's business decision to calculate its "lost opportunity" costs as an alternate NSF Fee based upon the prime rate of interest it could have earned. It did not represent interest charged as a result of an advance of funds from State Bank to National Settlement or any other Island Mortgage affiliate.

The case of *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir.1988) also is instructive regarding the significance of a bank imposing fees and charges on depositors in an NSF situation. In *Chase & Sanborn*, Societe Generale charged Colombian Coffee interest at a rate of 12.25% per annum for the day of November 29, 1982, which reflected Societe Generale's costs due to the paper overdraft created when the clearing house debited Societe Generale's account in the amount of $500,000. This charge was incurred before Societe Generale had decided whether or not to honor the check and would have been charged regardless of whether it had decided to honor or bounce the check. The Eleventh Circuit found: "Charges for handling such administrative matters are routine. The fact that a charge was made is not significant enough to warrant a finding that the bankruptcy court's assessment of the transaction was erroneous." *Id.* at 1201.

In view of the foregoing, the Court cannot find solely from the fact that State Bank imposed on Island Mortgage a fee for NSF activity that State Bank had extended a loan to Island Mortgage.

#### IV. *Transfers Into The Disbursement Account.*

 As State Bank did not extend credit to Island Mortgage, the transfer of funds from the Wire Account into the Disbursement Account was not a transfer of an interest of the Debtors in property "to or for the benefit of State Bank," which is a necessary element of a preference claim under Section 547(b)(1) of the Bankruptcy Code. The Debtors' funds were paid to the check payees only, and State Bank derived no benefit therefrom as it was never liable for payment of the checks because no overdrafts occurred in the Disbursement Account as of the midnight deadline on June 6, 2000.

In view of the foregoing, the Trustee's preference claim must fail. Under the particular facts of this case, the transaction does not fall within the provisions of bankruptcy law on voidable preferential transfers. Moreover, the Trustee cannot recover from State Bank, as it served merely as a commercial conduit in the transactions at issue.

#### V. *State Bank Acted as a Mere Conduit.*

 Section 550(a) of the Bankruptcy Code sets forth parties against whom a trustee may recover property once the trustee has established an avoidable preference or fraudulent conveyance. Although the Trustee has not established an avoidable preference, even if he had, the Trustee would be precluded from recovering from State Bank, as it was a "mere conduit" for facilitating the transfer of funds from the Island Mortgage entities to the payees of the checks written on the Disbursement Account.

 Section 550(a) of the Bankruptcy Code provides that a plaintiff may only recover the transferred property or the value thereof from "(1) the initial transfer-

ee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). The Trustee's preference claim runs afoul of the well-settled body of preference law which holds that an entity which is a "mere conduit" for the funds at issue, as State Bank was here, is not an "initial transferee" for purposes of Section 550(a).

The seminal Second Circuit case on this issue is *Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52 (2d Cir. 1997), *cert. dismissed*, 524 U.S. 912, 118 S.Ct. 2295, 141 L.Ed.2d 154 (1998) (*"Finley Kumble"*). There, the Second Circuit rejected the notion that the mere fact that an entity is the first to receive a transfer from a debtor means that the entity is the "initial transferee." The Second Circuit adopted the rationale in *Bonded Financial Services, Inc. v. European American Bank (In re Bonded Financial Services, Inc.)*, 838 F.2d 890 (7th Cir.1988), stating as follows:

> We think the wording of section 550(a) is not so plain as to compel, or persuasively argue for, the principle that every conduit is an initial transferee. The statutory term is "transferee"—not "recipient"—and is not self-defining. *See id.* Numerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch the disputed funds-and the initial transferee under section 550. *See, e.g., Rupp v. Markgraf*, 95 F.3d 936, 940 (10th Cir. 1996) ("courier" of check from debtor to principal's creditor not an initial transferee); *Malloy v. Citizens Bank (In re First Security Mortgage Co.,)*, 33 F.3d 42 (10th Cir.1994) (bank); *Security First Nat'l Bank v. Brunson (In the Matter of Coutee)*, 984 F.2d 138 (5th Cir.1993) (law

firm holding funds in trust account); *In re Colombian Coffee Co.,* 75 B.R. at 179 (bank); *Salomon v. Nedlloyd Inc. (In re Black & Geddes),* 59 B.R. 873 (Bankr. S.D.N.Y.1986) (steamship agency acting as collection agent); *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334 (Bankr.S.D.N.Y.1983) (law firm acting as escrow agent).

\* \* \* \* \* \*

Every Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability, declining to find "mere conduits" to be initial transferees, under the principles first articulated in *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334 (Bankr.S.D.N.Y.1983). For example, in *Bonded Financial,* an insider of the debtor corporation had caused the transfer of corporate funds to his personal bank account, and then directed the bank to debit his account in that amount and to apply the funds to reduce the indebtedness to that bank of another entity he owned. 838 F.2d at 891. The trustee in bankruptcy sued to recover the funds from the bank. The Seventh Circuit, adopting what has come to be known as the **dominion and control test,** ruled that *"the minimum requirement of status as a transferee is dominion over the money or other asset, the right to put the money to one's own purposes." Id.* at 893. Noting that the bank "acted as a financial intermediary" and "received no benefit," *id.,* the court concluded:

> [t]he [b]ank had no dominion over the $200,000 until ... [the insider] instructed the [b]ank to debit the account to reduce the loan; in the interim, so far as the [b]ank was concerned, [the insider] was free to invest the whole $200,000 in lottery tickets or uranium stocks.

*Id.* at 894.

The Seventh Circuit's logic has been widely adopted [citations omitted].

We join these other circuits in adopting the "mere conduit" test for determining who is an initial transferee under § 550(a)(1).

*Finley Kumble,* 130 F.3d 52, 56–57 (emphasis supplied).

 Accordingly, under the governing test to determine whether a recipient is a "mere conduit," formulated by the Seventh Circuit in *Bonded Financial,* and subsequently adopted by the Second Circuit, conduit status hinges on whether the defendant acquired "dominion over the money or other asset, the right to put the money to one's own purposes." *Finley Kumble,* 130 F.3d at 57 (quoting *Bonded Financial,* 838 F.2d at 893).

 In the instant case, National Settlement wrote checks that were presented for payment on June 5, 2000. On June 6, 2000, the checks which were funded cleared, and State Bank merely followed the depositor's stop payment order with respect to the rest. State Bank got nothing out of the deposit of monies into the Disbursement Account. The "initial transferees" of the checks that cleared on June 6 are the payees of those checks. They are the ones who received something of value from National Settlement. State Bank was merely a conduit for that transfer of money from National Settlement to those payees.

Additionally, State Bank could not be the "entity for whose benefit the transfer was made," for purposes of Section 550(a), because, as indicated above, there was no debtor-creditor relationship between Island Mortgage and State Bank in regard to this transaction. Specifically, as no overdraft occurred in the Disbursement Account on June 5, 2000, State Bank did

not extend credit to Island Mortgage. Therefore, State Bank did not reap any benefit from the cash infusion into the Disbursement Account on June 6, 2000, which funds were used solely to pay $7.3 million in checks to the check payees.[11]

The Trustee argues that, when a bank receives money from a debtor to pay off a debt owed to the bank, the courts have uniformly found that the bank had "dominion and control" over the funds and, consequently was not a mere conduit. (Trustee's Reply Memo, p 24). However, the loan repayment cases that the Trustee cites have, as their underlying facts, actual and quite traditional loans by the banks at issue.[12] Those cases are easily distinguishable from the instant case, as State Bank did not extend credit to Island Mortgage. The Trustee has not cited any precedent treating an NSF position in a checking account where no payout is made thereon, as a "loan" by the bank to its customer in the amount of that NSF position.

Although the Trustee asserts that the $7.3 million deposited into the Disbursement Account on the morning of June 6, 2000 by Island Mortgage affiliates was of "direct and concrete economic significance" to State Bank (Trustee's Reply Memo, p. 23), the Trustee cites no evidence to support this claim. Instead, the evidence shows that State Bank was economically indifferent to whether the NSF checks were stopped, fully funded or left unfunded and, consequently, bounced by State Bank. The only benefit State Bank received from this relationship in regard to these bank deposits and payment to payees was the fees it collected for the service it performed. The Court finds those fees to be reasonable as such, and not preferential payments to it for an antecedent debt.

In sum, State Bank served as a mere conduit between Island Mortgage and the payees in regard to any preferential payment. The Court need not and does not decide in connection with these summary judgment motions whether the conduct of

---

**11.** The Court notes that affiliates of Island Mortgage were the payees on $3.65 million of the $7.3 million in checks that cleared on June 6, 2000 and, consequently, only one-half of the funds transferred into the Disbursement Account actually left the control of Island Mortgage. Specifically, $2.615 million was deposited into the account of AppOnline; $146,390 was deposited into the operating account of Island Mortgage; $2,220 was deposited into the account of Action Abstract; and $885,000 was deposited into the Duboff PC Escrow account. (Wagner Aff., ¶ 4, Exh. B). Clearly, AppOnline, Island Mortgage and Action Abstract were affiliates. In fact, the Chapter 11 cases of payees AppOnline, Island Mortgage and Action Abstract were substantively consolidated with the Chapter 11 case of National Settlement by Order dated September 7, 2001 on the basis that "the business operations and financial affairs of all those debtors were inextricably intertwined." (Trustee's Reply Memo, p. 5, n. 3). Moreover, the Chief Financial Officer of Island Mortgage, Cindy Eisele, also exercised total control over the bank accounts of the fourth

payee, David Duboff, P.C. (Garner Supp. Decl., Exh. 2—deposition testimony of David Duboff, Esq., stating that he gave Cindy Eisele his signature stamp and that she maintained total control over all activities in the Duboff bank accounts maintained at State Bank, 1/14/01 Tr., pp. 234–35). This is significant because a check written on one State Bank account to another State Bank account never passes through the N.Y. Fed (Tr. 2/11/03, p. 53) and, therefore, $3.65 million in checks that were paid to affiliates of Island Mortgage should not be part of this preference analysis.

**12.** *See First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),* 974 F.2d 712, 721–22 (6th Cir.1992) (bank had loaned $1.1 million to facilitate acquisition of bonds; bank held to be initial transferee of payments received reducing loan obligation); *Lippi v. City Bank,* 955 F.2d 599, 610–11 (9th Cir.1992) (bank had loaned $250,000 to finance leveraged buy-out; bank held to be initial transferee of payments received eliminating that indebtedness).

State Bank vis-a-vis the Island Mortgage accounts violated any provisions of the Bankruptcy Code other than Section 547(b) or any other statute, law or regulation. Therefore, the findings made herein are limited to the issues presented in connection with the Trustee's preference claim and may not necessarily be given preclusive effect in any action or proceeding brought against State Bank pursuant to any other section of the Bankruptcy Code or any other statute, law or regulation, in this Court or any other forum.

## CONCLUSION

1. This matter is before the Court pursuant to Fed. R. Civ. P. 56, as made applicable to bankruptcy cases by Fed. R. Bankr.P. 7056.

2 This is a core proceeding.

3. The Court finds that there is no genuine issue as to any material fact.

4. The Court grants the defendant State Bank's cross-motion for summary judgment as to the plaintiff's preference claim only.

5. The Court denies the Plaintiff's motion for summary judgment and dismisses the complaint in regard to allegations pursuant to 11 U.S.C. § 547 for preferential payments, as the plaintiff has not established the existence of an antecedent debt to defendant State Bank, which is a necessary element of a preference action.

6. Even if the plaintiff had established all the elements of a preference action, the plaintiff may not recover from State Bank under 11 U.S.C. § 550(a), as State Bank acted only in the capacity of a commercial conduit in regard to the alleged preferential payments.

7. The Court makes no decision as to the plaintiff's fraudulent conveyance claims, or any other claims raised in its complaint.

8. The parties to this adversary proceeding are to appear before this Court on September 9, 2003 at 2:00 p.m. for a pre-trial hearing in regard to the remainder of the complaint.